May it please the Court, I'm Frederick Landers of the Exelon Law Group. I represent the plaintiff and appellant in DPS Electronics. I'd like to reserve three minutes of my time for a moment. This appeal involves a de novo review of the trial court's interpretation of an unambiguous written contract, the application of the law, and the implied covenant of good faith and fair dealing and fiduciary duty. My client does not dispute any of the district court's findings of fact, rather we focus squarely on the conclusions of the law. The first issue, the interpretation of the contract, the parties and the trial court agree the contract is not ambiguous. There's no need for parallel evidence. We have limited express language in the agreement. Mr. Counsel, let me just ask you this. I am inclined to agree with you about the construction of the contract, but I just want to be sure of one thing. I'm a former California lawyer, and we have some very strong limitations on contracts that interdict competition and things of that nature. I gather there are no legal impediments to this contract of that nature. Is that correct? I don't believe so, Your Honor. And the reason being Montana does have a statute that gives us covenants and restraints for it. However, all of the cases construing the statute relate to the enforceability of those covenants in the context of employment agreements, partnership agreements. Well, here the district court made no findings about reasonableness because of its interpretation, correct? That's correct, Your Honor. So if you were to prevail on your other argument, shouldn't we send this back to the district court to deal with the reasonableness of the covenant? Well, Your Honor, I think the argument, my client's argument on that point is... We should address that in the first instance as a matter of state law? I believe so, Your Honor. The reason being is, like I said, that statute has no application in this case. Well, but are you saying that in state court in Montana, these covenants are not subject to a reasonableness analysis? So two people get together, this same covenant, let's assume it covers... It says, and you won't work in this field ever again for the history of mankind. I assume a court would find that to be unreasonable, wouldn't you? I would think so, Your Honor. And since the court here never addressed that, let's assume you win on everything else. And I must say, I'm inclined to buy your interpretation of the contract. But if you win on everything else, doesn't the issue of reasonableness go back for trial? Well, like I said, Your Honor, I think that statute has no application. The reason being... Well, let's assume the statute has no application. In Montana, when dealing with contracts of this kind, isn't the reasonableness of the restriction something a district court or a trial court would take into account in determining whether or not to enforce the covenant? I would think so, Your Honor. And that this court never did because it never had to? That's correct. Okay. Now, there is an independent reason for not reaching that question, and that is the fiduciary duty claim. Let's assume for a moment that that one, if this is an independent contract, doesn't work for you. But you do have the issue of not only do you have direct or indirect competition, but or any company products and services. The court didn't really deal with that latter part. So let's assume for a moment that you are correct on that point. Isn't Judge Hurwitz correct? We would need to send this back to the trial court to treat that aspect of the case, and as part of it, the reasonableness of that decision would inevitably be taken into consideration. Your Honor, if the case is sent back on the grounds of the interpretation of contract, then I believe that would be an appropriate consideration for the trial court. Okay. However, we have cited authority in our briefing in the context of fiduciary relationship. There is an independent duty. So why do you think this is a fiduciary relationship? There's nothing in the independent representative agreement that so suggests, is there? Well, as we've argued, it is an agency relationship. Well, it's an agency relationship, but it's a very – I mean, I suppose we can call it an agency relationship, but what they're basically saying is we want you to sell our products. Why are they a fiduciary, having agreed to market the products? Well, the case law decided is that when commissioned, there's an inherent fiduciary relationship and a sales agency relationship. And also – How could that be? A fiduciary relationship is one where there's a special element of trust. I mean, we all know what the common examples are, but are you suggesting that if somebody is selling on a commission, that there's a fiduciary relationship? Why wouldn't that change the world? Well, that is the holding of the case we cited, warning the mailers of the Montana Supreme Court. Aren't the facts a little different there? In that case, there are different facts, but that case also involved a sales agency relationship. How are we to construe the language in the contract itself at ER 936 Section 7 that says that DPSC is an independent contractor and is neither an agent nor an employee? That's pretty specific, isn't it? It is, Your Honor. Do we ignore the contract on that basis? Well, we look at the contract as a whole, I think. No, but the specifics override the generalities. So what else is there in the contract as a whole? I mean, you started out by saying, well, they're an agent. Well, they say they're not. What is there in the contract as a whole that suggests a fiduciary relationship? The contract's pretty short, and to me it just suggests a sales relationship, does it not? Well, it has two provisions, I think, that demonstrate a fiduciary relationship, and that's the confidentiality clause and the agreement not to compete. It was contemplated that there was going to be a close association between my client, TPSC. Information, extremely sensitive and proprietary information, is going to be shared. TPSC would be hitting the road on behalf of my client, dealing directly with the potential purchasers of his products. My client wanted its representative to have undivided loyalty and believe in the products that they were selling. But your client never included in this. There's a very specific clause that describes the legal status of TPSC, and surely if your client wanted it to be a fiduciary, couldn't they have put that in the agreement? Do we imply that into agreements? I think you do, Your Honor, under these circumstances, and what's been described by TPSC as this close association between the two companies. Now, if I could get back to the issue of the clause in the agreement that says TPSC is an independent contractor. Montana case law is that how a relationship is characterized in an agreement is not necessarily controlling. An independent contractor can, in fact, be an agent, and that is beyond dispute, as we've cited in our briefs. And what facts would you refer us to that would raise, contrary to the express language of the agreement, which I gather was provided, I don't know who provided the form, but that would raise this up to a fiduciary relationship, in other words, like a bank officer or a trustee or an ERISA program supervisor. These are serious, high-level, special-level kinds of arrangements. I must confess I don't see anything in the evidence that would do that. What am I missing? Well, Your Honor, there was testimony in the trial describing the nature of this particular market. It's a niche market. We've got a few major railroads, some smaller ones. It's based on close relationships. When companies spend millions of dollars, capital expense and research and development, to come out with new products, they're sharing information with the representative, getting feedback, having the representative get feedback from the customers that should be passed back, unfiltered, to the developer of the product. And they want to know, this is all done for competitive advantage, obviously. My client, based in Montana, is not on the road going around to these customers selling products, meeting with the purchasing agents and so forth. Should have not? Generally not, Your Honor. Maybe I misunderstood. I thought they had been doing that for quite some time and indeed had tried to enter into a relationship with the very people that you're upset about now, and they didn't have enough resources to complete some kind of development. Did I miss something? That's correct, Your Honor. And there was also testimony that the reason my client decided to outsource its sales operations was so that it could stay back home and focus on product development. But they had been out and talked with other people about developing this very function, right, in this train arrangement. They have, and they do themselves. So this is not exactly a closely guarded secret. It's like an NSA thing where everybody knows it. Well, it's not that secret. And we cited some of the documents in the case when TPSC was out representing this other company, Udell, they made it a point to keep the information confidential. Let me ask, because this case was decided the way that it was below, am I right in thinking that the district court made no findings as to whether or not Udell was either directly or incorrectly, indirectly competing with DPS? Your Honor, the findings of fact on the issue are pretty sparse. So, again, let's assume, again, I want to go back to Richard Smith's story. Let's assume this is not a fiduciary relationship, but we agree with you that the non-compete is not limited to the specific products listed in the exhibit. As I think about it, there are at least two triable issues here. One is whether or not the non-compete is reasonable. And the second one is whether or not they were actually competing directly or indirectly. It seems from this record likely that they were, but nobody ever made a finding. Do you agree that if you don't win in the fiduciary, do you claim those two issues have to be sent back for trial? Your Honor, I think the court, this court, can decide those issues on the record. But there was quite a bit of testimony. I don't understand anything about trains. So how can I decide that issue on the record? Well, it's in the record, the trial testimony, the briefing as to how these two companies were competing against each other, both directly and indirectly. Yeah, I mean, it seems to me likely from this record that that is what a court would find, but you agree that no court found it here. Yeah, well, I think the findings are there on which the conclusion can be based. The trial court found my client was trying to develop this new device. I don't believe there was a specific finding that TPSC was, although that was undisputed at trial. So I think based on those two facts, it can be determined. The court did not make any findings, I gather, with respect to whether Mudell's product competed with DPS's product, whether Mudell is an indirect competitor of DPS, or whether the scope of the non-compete provision is reasonable under Montana law, right? None of those things occurred. Because the court basically didn't treat the second part of the formula here, which is whether they directly or indirectly compete with the company or any of its products. That's correct, Your Honor. Okay, so if we find that way, then we need to send this back to the court for a trial on the open issues at least dealing with the points that I just mentioned, right? Yes, Your Honor, that's correct. I'll reserve the balance of my time. Okay, go ahead. Thank you. Good morning. I'm Carlson for TPSC. First of all, with respect to the issue of competition and whether or not Mudell's products competed with DPS, Mudell never made a product. No product was ever brought to market. No sales of Mudell non-existent products were ever made. There was no competition, direct or otherwise, between Mudell and DPS. The district court made findings on that issue. What the district court said is that with respect to the product at issue, the new EOT, during the course of the contract, DPS had a plan and an objective to develop a product but never brought one to the market during the existence of the company. Well, but that doesn't necessarily end the issue for me. DPS was marketing replacement parts for existing EOTs, was it not? It was marketing replacement parts for existing EOTs on behalf of DPS, yes. Right, and I forget the manufacturer of the EOT, but somebody else was making an EOT and DPS was selling replacement parts for that EOT. That's correct. And if Mudell went to a customer and sold their EOT, then necessarily they weren't going to need replacement parts for the other ones, correct? Not necessarily because there's different classes of railroads. The used EOT market targeted a secondary class of railroads. The new EOT market was designed to target a primary market, Burlington Northern and Southern. My difficulty is that I can't tell that from this record. In other words, at least on the face of the record, it seems to me not, I know that DPS wasn't marketing an EOT, but it seems to me that it's at least plausible, the judge made no findings on it, that there was indirect competition in the sense that if DPS, all the acronyms are driving me crazy here, but if TPSC were out marketing Mudell's new EOT, it at least seems conceivable to me that that would have foreclosed the replacement part market to the person who bought that EOT in preference to the EOT that DPS was serving. Possibly to that specific person, but they are two separate and distinct markets in the industry. But there's a record. Is there a finding of that in the record? There isn't a finding in this finding. Okay. Now, can we go back to the non-compete? Because I'm having trouble with the district court's reading of the non-compete. The non-compete says, it's paragraph 14, that TPSC agrees not to consult with, become a representative or employee of any company which directly or indirectly competes, and then it says with the company or any company products or services. As I read the district court's order, it seemed to read the company out of this. How do you respond to that? Well, I respond to it by saying that the specific agreement dealt specifically with the products listed on Exhibit A. No, and I understand that. That's the scope of the agreement. Exactly. Focus on the language, competes with the company. Doesn't that mean something broader than or any company products or services? Not in the context of this agreement, I don't think, Your Honor, because TPSC was a sales representative for multiple companies throughout the industry, multiple products. Under that interpretation, DPS could say, even though we've listed these other groups, you're, in fact, competing with us. That clause is way too broad in the Montana law. But, counsel, with respect, this is written in disjunctive. And if I recall it, Exhibit D was where you basically said, hey, right now we're dealing with these people, so those are accepted out, whatever Exhibit D said to that point. But the reality is it could be any number of other companies or any other number of products, at least looking at this at face value. Well, first of all, Your Honor, the exhibit I referred to was Exhibit E, which had a list of the specific products. I understand, but there's also Exhibit D, which is very common in these kinds of things. I did it for 37 years. And when you have these kind of things, you've got the representative out there, and the representative has been in the business before. So you want to exclude out, I embedded this, or I know these people, or I have these relationships. And so they get excluded out, and that's what Exhibit D presumably was. Products was in E. But the reality is it's not just limited to this company, and it's not just limited to these products, if you read the language directly, is it? I think it is because it's tied in. If you read the contract as a whole, it's tied into Exhibit E. Those products specifically needed to be listed before TPSC was in the market for DPS. It could be any company. It doesn't even have to be related to these products, does it? No, it has to be. That's what they agreed to do. They agreed to represent the company on those products. I'm sorry. I thought that Exhibit E, in effect, defined what the company products and services were. It did. Yes, okay. So anything that's not on that list is not a company product or service. Now, here's my problem, and it's the same one I started with. If that's all it said, I would agree with the district court's interpretation as a non-compete. But the non-compete says which directly or indirectly competes with the company or, and then it has, in effect, the products listed on Exhibit E. So focus on the company here. Your interpretation makes that language irrelevant, doesn't it? No, because I don't think the intent of the agreement was to focus on the company. I think it was to focus on the list of products. The other thing is what you have to look at in the overall context of the situation was Udell never had a product. There was no sale of any product. And you might win on the merits if this is the interpretation of the agreement, but I just want to focus on the interpretation of the agreement. I understand. When you say that it was not the intent of the parties, are you saying then that the word indirect is ambiguous in this contract? No, I don't think so. I think it's when you look at the contract as a whole, they are competing or not competing with respect to the products listed. And the plaintiffs acknowledged that they could have added products to that list and, in fact, did add products to that list, and that's where the whole idea of where the commissions were drawn from, what was on that list. And with respect to — With respect, counsel, doesn't that really get us back to what all of us have now been talking about, which is the district court and you are focusing exclusively on the products, but the contract doesn't just talk about products. It talks about dealing with organizations that directly or indirectly competes with the company end of stuff. And there's an or, and then you get to the products part. But the reality is the district court did not make any findings about that, didn't take any evidence about that. Well, there was evidence, but he didn't make any findings. That's correct. So the reality is if you look at the contract directly, isn't it likely the district court made an error in construing the contract on that point? I'm not sure in the context of this he did, because in the overall scheme of things — I know you want to focus on the product. No. I'm talking about the language. I understand. In the overall scheme of things, there really wasn't any competition. There wasn't a product out there. New Dell didn't have one. DPS didn't have one. They weren't competing. This was thoughts. This was ideas. Nobody, there was no damage to DPS for any action taken here because there were no sales missed. But now you're arguing why you'd win if the contract is interpreted the way Judge Smith and I suggest. But the judge didn't ever reach that issue, did he? Well, no, the judge didn't. But it's pretty clear here, and actually it's undisputed, that there was no product brought to market by DPS during the term of the agreement. New Dell never made a product, never sold a product. There was no prevention of sale of used EOTs. There was no loss of sales. There was no loss of market. There was no damage. DPS never introduced any evidence of any kind of damage whatsoever. And that's critical when you're dealing with products. But if that's not all we're talking about here, then that doesn't necessarily include the matter. With all due respect, they never proved any, showed any evidence that they lost, they suffered any damage whatsoever. They didn't lose any service contracts. They didn't lose any agreements. So with respect to the fiduciary issue, counsel argued that DPS didn't go out on the road. Well, that's not exactly true. DPS did go out on the road to talk to BN about the development of the new EOT, to the exclusion of TPSC. Did not tell TPSC they were going to do that. Held a secret meeting, admittedly. This fiduciary thing is, number one, does not make any sense in the context. They're sales reps. They're out on commission. They have booths. They meet with railroads. They do trade shows. They represent a variety of products. There is no Montana law that would support the creation of a fiduciary duty here. Just because they were close and knew some competences, it would be one thing if they breached the competence. There's no evidence that they ever disclosed any information that they got in competence. There's no evidence that they ever disclosed anything other than what was needed to sell DPS products. And, in fact, during the course of the representation, they sold more products for DPS than had ever been done. Two million plus. They were paid $208,000 in commission. That sounds like a pretty good deal for DPS in this situation. The cases cited by DPS for the fiduciary relationship are real estate agency contracts exclusively. And there's a statute in Montana that deals with real estate agent contracts. Let me ask you about what the district court did hold in this case. The district court said, thought that the noncompete was restricted to the products listed on Exhibit E, I think it is, and then found that there was no breach of the contract as so construed. I'm not clear what the other side's argument with respect to that is. I take it there was no evidence that they competed directly or indirectly with the products on Exhibit E. Is that your position? There was no evidence that Mudell was in competition for products and services on Exhibit E or that the company had. I mean, there was no evidence that Mudell competed with DPS for anything. Mudell never had a product. It was in the development stage. DPS's product was in the development stage. They never brought it to market. This is all about being upset about something Judge Smith pointed out. DPS had earlier talked to the Mudell folks about doing something. This is being upset about that and trying to drive an interpretation of the contract that just is not there. With respect to the breach of the implied covenant arguments, again, it's not there. So let's assume for a second that we disagree with you about the scope of the noncompete, and what do we have to ask the district court to do if we remand it, determine whether or not there was any direct or indirect competition, and then also determine whether or not if the noncompete is interpreted the way it appears to read, whether it's reasonable? Are those the two remaining issues in the case? If we disagree with you on both. That's right. And with respect to the issue of the covenant not to compete, just because Montana only has a smattering of cases and they all happen to be employment law cases, doesn't mean that the contract is not in the employment law section. We do have an employment relationship section of the code. This is in the contract code. The covenant not to compete here is the contract itself and the interpretation that they're trying to give it to violates Montana law clearly. You say it does? It violates Montana law. And what statute would you cite us to on that? Give me just a moment here. I think I've got it. It is 28.2-703, 704, 705, Montana Code Amnesty. So finally, with respect to the whole idea of the breach of the implied covenant, one of the cases cited by the... Just to finish up with this one point. So you're saying if we construe the contract in the way that you've heard us talk about, it's going to be struck down anyway because of the code section that you've just given to us, right? That's correct, Your Honor. Okay. And the case on point, Your Honor, Access Organics, Inc. v. Hernandez, 175 Pacific 3rd, 899. I'll cite on that again, please. Access Organics, Inc. v. Hernandez, 175 Pacific 3rd, 899. And doesn't the O'Neill case also deal with a nonemployment situation? Yes. I found at least one Montana Supreme Court case applying this statute to nonemployment situations. That's correct. Thank you. Finally, with respect to the breach of the fiduciary or the implied covenant of good faith and fair dealing, the Phelps case cited by Phelps v. Scranton, cited by DPS, actually supports the position taken by TPSC in this matter. Okay. It recognizes that in order to maintain a claim for breach of the implied covenant of good faith and fair dealing, it is insufficient to present evidence that the other party acted in bad faith, i.e., by holding secret meetings or breaking promises. Instead, the party must also come forward with evidence sufficient to support the conclusion that as a result of the other party's actions, the claimant was deprived of a benefit justified under the contract, a benefit under the contract which they did not prove fair. And I'm out of time. All right. Thank you very much for your argument. Counsel, we've got a little bit of rebuttal time. Thank you, Your Honors. I agree that it is important to highlight this disjunctive language, and there's a reason for the clause that comes before the or. It's contemplated on the face of this agreement that this list of products and services is not going to remain static throughout the entire relationship. DPS is going to develop new products. It takes years to work on them, bring them to market. In paragraph 7 of the agreement, it refers to new products and services being added and sold by DPSC. Counsel, opposing counsel has cited us to the Montana statutes in at least one case, and he indicates that if we send this disjunctive portion dealing with indirect or direct competition with the company back to the district court, that it would be unlawful under Montana law. What's your position on that? Well, Your Honor, the Montana Supreme Court has never considered a case, but these cases cited do not relate to the enforceability of the covenant during the active term of the relationship. I think if parties could not prohibit their counterparts from competing against them while they're still actively in business together, there wouldn't be any foundation or trust for these kinds of relationships in general. And I think it's no different if there was a high-level employee of Google who had access to the company's information and then wanted to go work for Yahoo as a direct competitor during the time of the agreement. Certainly that could be prohibited as long as the company is in business. Thank you both for your argument. Very helpful. We will stand in recess for today.
judges: Alarcon, Smith, Hurwitz